## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| TIMOTHY R. RASNICK, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:11-CV-00283** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Timothy Rasnick appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]

(*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Rasnick obtained DIB as of August 1, 1994, at the age of twenty-one due to impairments

resulting from closed head injuries incurred in a bicycle accident at age fourteen and a car

accident when he was twenty-one. (Tr. 51-52, 708.)  Upon reevaluation in 2004, however,

Rasnick's disability was found to have ceased as of August 26, 2004. (Tr. 50, 481-98.)

Rasnick's date last-insured for DIB was June 30, 2006 (Tr. 481), and thus he must show

he was disabled by that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

Rasnick applied for continued disability on December 16, 2004, and an unfavorable

---

[1] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

determination was issued on April 20, 2005. (Tr. 48, 90.)  Rasnick filed a timely request for a hearing, and on April 3, 2007, a hearing was conducted before Administrative Law Judge ("ALJ") Richard VerWiebe, at which Rasnick (who appeared *pro se*), two witnesses, and a vocational expert ("VE") testified. (Tr. 449-63.)  On November 20, 2007, ALJ VerWiebe issued Rasnick an unfavorable decision, which, after the Appeals Council denied review, became the final decision of the Commissioner. (Tr. 22-31, 542-44.)

Rasnick filed a complaint with this Court on August 11, 2008, seeking relief from the Commissioner's decision. *Rasnick v. Astrue*, No. 1:08-cv-188 (N.D. Ind. June 17, 2009).  On May 27, 2009, the undersigned Magistrate Judge issued a Report and Recommendation, recommending that the Commissioner's decision be reversed and remanded, which the District Court adopted; the case was then remanded for further proceedings. *Id.*

On September 30, 2009, a remand hearing was held before ALJ Terry Miller, at which Rasnick (who this time was represented by counsel), his father, and a VE testified. (Tr. 699-756.) On March 1, 2010, ALJ Miller rendered an unfavorable decision, which, after the Appeals Council denied review, became the final decision of the Commissioner. (Tr. 464-66, 481-98.) Rasnick filed a complaint with this Court on August 19, 2011, appealing the Commissioner's final decision terminating his disability benefits. (Docket # 1.)

## II.  RASNICK'S ARGUMENTS

Rasnick alleges essentially three flaws with the Commissioner's final decision. Specifically, Rasnick claims that the ALJ erred by (1) improperly discounting the opinion of his treating physician, Dr. Fawver; (2) assigning too much weight to the opinions of Dr. Von Bargen, an examining psychologist, and Dr. Unversaw, a reviewing state agency psychologist;

2

and (3) "failing to mention" or "discuss" the symptom testimony provided by his father, Enos Rasnick. (Pl.'s Opening Br. 16-19.)

### III. FACTUAL BACKGROUND[2]

#### A. Background

At the time of the ALJ's decision, Rasnick was thirty-six years old; had a high school education and two or three years of college; and possessed work experience as a cashier, dough mixer, and material handler. (Tr. 109-13, 176, 190.)  At the hearing, Rasnick testified that he was going through a divorce and was living with his parents in a two-story home; his bedroom was upstairs. (Tr. 704-06.)  He stated that he performs his self care independently. (Tr. 732.)  He also reported that he can prepare simple meals, do housework, mow grass, and go grocery shopping, but does not do so because his wife or mother performs these tasks; he does, however, help cut down and trim trees. (Tr. 732-34.)  He works out at the YMCA every day, drives a car, plays games on his computer and checks email, and has visitation rights with his young son several times a week. (Tr. 705-06, 730-31.)  He used to put together model cars and volunteer for the Red Cross by making deliveries, but has "lost interest" in those activities in the last year. (Tr. 712-13, 735.)  He is able to go out to dinner on his own, goes to church weekly, and occasionally visits friends. (Tr. 728, 735.)

As to his impairments, Rasnick complained of poor memory, difficulty paying attention, a low frustration level, and, in recent years, an increase in anxiety and depression. (Tr. 713, 723-25, 728, 737-40.)  He makes lists to help him remember things and takes medication for his

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 756-page administrative record necessary to the decision.

depression and anxiety; he experiences a "loss of interest" as a side effect of the medication. (Tr. 725, 727-28.)  He also said that he has constant coordination problems and tremors in his non-dominant arm and thus "can't use it" except for "[s]omething simple." (Tr. 714-17.)  He further claimed that he was "shaky all over" and "unstable," walks and climbs stairs at a slower pace, and tires easily. (Tr. 717, 738-39.)  Rasnick estimated that he could walk for one mile, sit indefinitely, and can lift sixty pounds. (Tr. 719-21.)  He stated that has some difficulty with balance when bending over to put on his shoes and falls about once a week when doing this task.[3] (Tr. 723.)

### B.  Summary of the Relevant Medical Evidence

Rasnick sustained a severe head injury as a child in the late 1980's. (Tr. 243-360.)  He was in a coma initially and, upon recovery, underwent physical and speech therapy for vocal paralysis, swallowing difficulty, nystagmus, marked dysmetria in his right upper and lower extremities, gait ataxia, and cognitive problems, which were causing difficulty with his short-term memory. (Tr. 243-360.)

In 1990, Rasnick injured his hand, which required splinting; he was noted to have quadriparesis with L'hermitte's phenomenon, hyperreflexia, and Babinski sign. (Tr. 275-95.)  Dr. Stephen Schroeder recommended cervical spine surgery because any trivial bump could cause Rasnick a spinal cord injury; accordingly, Rasnick underwent a cervical corpectomy and fusion. (Tr. 275-95.)  Dr. Schroeder reevaluated Rasnick in March 1993, noting that he had a dysarthritic voice, social problems, hyperreflexia, decreased alternating motion rate of the hands

---

[3] Rasnick's father also testified at the hearing, essentially corroborating Rasnick's testimony. (Tr. 742-45.)

and feet, and fine motor and cognitive deficits. (Tr. 288-89.)

Also in March 1993, Rasnick was seen by Ronald Williams, Ph.D., a neuropsychologist, who found him to have average to low intellectual abilities and a lack of discipline and attention likely related to his head injury. (Tr. 285-87.)  Dr. Williams conducted the Wechsler Adult Intelligence Scale (WAIS-R), Woodcock-Johnson Test of Achievement, and Tactual performance test, revealing a verbal IQ of 96, a performance IQ of 90, and a full scale IQ of 93, as well as mild impairment in fine motor skills, a seventh-grade math level, fourth-grade writing skills, impulsivity, distractability, an inability to maintain his attention on one activity or in one direction, personality problems, and a possible attention deficit disorder. (Tr. 281-84.)

In 1994, Rasnick, who was twenty-one years old at the time, sustained injuries in a motor vehicle accident; he was placed in a halo vest. (Tr. 325.)  In November 1994, Dr. Mark Porter evaluated Rasnick, observing a significant gait imbalance, upper extremity tremors, ocular dysmetria, mild cerebellar dyskinesia, mild dysarthria, inappropriate facial expressions, social difficulties, impaired short-term memory, very poor impulse control, difficulty with concentration and focus, and a tendency to make inappropriate statements. (Tr. 278-79.)  Dr. Porter noted that Rasnick was very dependent upon his parents. (Tr. 279.)

On January 23, 1995, Mac Halberstadt, a social worker, documented that Rasnick's work history reflected problems with staying on task, distraction interfering with production, slow assembly work, and difficulty focusing. (Tr. 302.)  He opined that for Rasnick to succeed in a work setting he would need someone to check his work and assist him in keeping focused on the task at hand. (Tr. 302.)

In December 1995, Rasnick underwent a neuropsychological evaluation by Gregory

Sowles, Ph.D. (Tr. 305-13.)  Testing revealed the following: inappropriate laughter and facial

expressions, confusion in understanding verbal dialogue, mildly impaired attention and

concentration, tangential thinking requiring redirecting, abnormal articulation and phrasing, gait

and balance problems indicating lingering cerebellar dysfunction, poor fine motor dexterity,

impulsivity, impaired right grip and manual dexterity, difficulty remembering story details,

moderately impaired psychomotor speed, mildly impaired mental flexibility, low intermittent

verbal memory, impaired spatial element memory, difficulties with perseveration, impaired

categories test range, moderate concept formation impairment, moderate problem solving

difficulties, a verbal IQ of 106, a performance IQ of 83, and a full scale IQ of 96. (Tr. 305-13.)

Rasnick demonstrated an eighth-grade arithmetic, high-school spelling, and post high-school

reading levels. (Tr. 309-13.)  Dr. Sowles opined that an antidepressant may be useful and that

Rasnick needed to become independent of his family. (Tr. 309-13.)

  In May 1998, Rasnick underwent a consultative physical evaluation by Dr. George

Merkle at the request of the state agency. (Tr. 329-32.)  Dr. Merkle found Rasnick to have

quadriparesis with a need for further vocational rehabilitation due to an inability to perform

gainful activity. (Tr. 329-32.)  Upon examination, Dr. Merkle observed significant spasm

affecting posture and gait, moderate difficulty getting on and off the examination table, spasticity

with all movement, difficulty with walking and hopping, stiffness, reduced grip strength,

deterioration of fine finger manipulative abilities, moderate dysdiachokinesia, and limited range

of motion in his cervical and dorsolumbar spine. (Tr. 330-33.)

  Also in May 1998, Rasnick underwent a consultative psychological examination by

Daniel Hauschild, Psy.D., who found him to have coordination problems, an euthymic affect,

6

irritable mood, reading difficulties, and difficulty with visual recall. (Tr. 334-38.)  He diagnosed Rasnick with an impulse control disorder and traumatic brain injury. (Tr. 338.)

In July 1998, Dr. A. Lopez, a state agency physician, completed a residual functional capacity assessment, indicating that Rasnick could lift no more than ten pounds; stand or walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; perform unlimited pushing or pulling; and occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. (Tr. 361-68.)  He further opined that Rasnick was limited in gross and fine manipulation and should avoid hazards such as machinery and heights. (Tr. 364.)

Five years later, in July 2003, Rasnick visited Dr. James Dozier. (Tr. 406-07.)  He noted increasing tremulousness and recommended that Rasnick undergo brain and cervical MRIs. (Tr. 406.)

On July 2, 2004, Rasnick was evaluated by Wayne Von Bargen, Ph.D., a state agency psychologist. (Tr. 369-71.)  Rasnick related that he was taking online classes and that although he was getting better, his coordination interfered and he had not been able to keep jobs. (Tr. 369.)  Psychological testing was negative for significant cognitive deficits. (Tr. 370.)  Scores from memory testing were all within the average range, except for delayed auditory recognition, which was low average. (Tr. 370, 372.)  Rasnick's capacity to recall information and sustain attention and concentration were also average. (Tr. 370, 373.)  Dr. Von Bargen gave no Axis I diagnosis and simply noted a history of brain injury on Axis III; he assigned a Global Assessment of Functioning ("GAF") score of 65.[4] (Tr. 371.)

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional

That same month, Rasnick underwent a consultative physical examination by Dr. Venkata Kancherla, at the request of the Social Security Administration. (Tr. 374-76.) He found that Rasnick had limited range of motion in his cervical spine, no motor deficits, and normal gait and speech. (Tr. 374-76.) In August, K. Neville, Ph.D., a state agency psychologist, opined that there were no medically determinable impairments, and his opinion was later affirmed by several other state agency physicians. (Tr. 377, 391, 393-94.)

On October 1, 2004, Dr. Dozier wrote a letter stating that the cervical MRI revealed profound artifact from his fusion hardware; he recommended further testing due to difficulty in assessing the spinal cord. (Tr. 441-42.) On December 16, 2004, Dr. Bruce Guebard penned a letter indicating that Rasnick's cognitive impairments cause him to be unable to work effectively, noting that he had impaired short-term memory, very poor impulse control, some immature behavior, inappropriate laughing and statements, and difficulty staying focus with little improvement in response to psychological interventions. (Tr. 395.) In January 2005, Dr. Dozier noted that Rasnick had clicking in his neck and long-standing spasticity. (Tr. 401.) He recommended physiatry and other therapy measures for Rasnick and stated that if these failed, cervical myelography surgery might be necessary. (Tr. 401.) Dr. Dozier also opined that Rasnick had reached a neurological plateau and that he continues to be disabled. (Tr. 401.)

In February 2005, D. Unversaw, Ph.D., a state agency psychologist, reviewed Rasnick's record and concluded that there was no medically determinable impairment. (Tr. 408-21.) In March 2005, Rasnick was evaluated by Dr. David Lutz at the physical medicine and

---

panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

rehabilitation clinic. (Tr. 431-33.)  He documented that Rasnick had cognitive and coordination difficulties and clinical symptoms of intermittent neck pain; he referred Rasnick to physical therapy. (Tr. 431-33.)  Upon exam, Dr. Lutz noted ataxia, slurred speech, and myofascial tenderness. (Tr. 433.)  Rasnick started physical therapy that same month; the physical therapist observed cervical stiffness, myofascial trigger points, and loss of motion. (Tr. 429-30.)  Rasnick experienced some improvement after several sessions. (Tr. 422, 426-28.)  On April 27, 2005, Dr. Lutz noted the improvement with physical therapy and stated that he did not recommend a cervical fusion; he instructed Rasnick to perform home therapy and use Ibuprofen or Naproxen. (Tr. 425.)

On September 6, 2006, Dr. Williams saw Rasnick and noted that his ability to regulate his temperament and impulsivity is impaired and that he has low self esteem and becomes frustrated due to an inability to keep up with others; he prescribed Lexapro. (Tr. 446-47.)  In March 2007, mental health counselor Ken Shields indicated that Rasnick was motivated to do his best, but easily loses track in conversations and tends to answer questions quickly and with little thought. (Tr. 448.)  He indicated that Rasnick's GAF had improved from 55 to 65 after participating in counseling. (Tr. 448.)  He noted that Rasnick was volunteering for the Red Cross making deliveries and was working on models late at night. (Tr. 448.)  The next month, Dr. Williams penned a letter indicating that he last saw Rasnick in September 2006, that his condition had improved over the years and he had reached his maximum medical improvement, and that any treatment was focused on managing his conditions. (Tr. 445.)

Dr. Jay Fawver treated Rasnick from June 2007 through 2009. (Tr. 605-08.)  Upon initial evaluation, Rasnick complained of poor concentration and memory, increased frustration and

9

irritability, anger, and anxiety, all which worsened after the birth of his son in March 2006. (Tr. 605-06.)  On mental status exam, Rasnick presented as pleasant, calm, and cooperative. (Tr. 607.)  He demonstrated a full range and appropriate affect; appropriate insight and good judgment; and his thought processes were logical, sequential, goal-directed, and coherent. (Tr. 607.)  No memory disturbances were evident. (Tr. 607.)  Dr. Williams diagnosed major depression, recurrent, moderate severity; generalized anxiety disorder; and post-concussion syndrome. (Tr. 607.)

Rasnick was seen by Dr. Fawver or his nurse on a monthly basis from 2007 to 2009 for medication management. (Tr. 605-95.)  On August 7, 2009, Dr. Fawver completed a mental impairment questionnaire, indicating Rasnick's diagnoses of major depression and a generalized anxiety disorder. (Tr. 599-604.)  He identified Rasnick's brain injury and marital strain as stressors, and medication side effects as chest tightness and shortness of breath. (Tr. 599.)  He assigned a "guarded" prognosis and listed the following signs and symptoms: feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, and emotional withdrawal or isolation. (Tr. 600.)

When completing a check-the-box assessment concerning the mental abilities necessary to perform unskilled work, Dr. Fawver wrote "unable to meet competitive standards"  in maintaining attention for two-hour segments, maintaining regular attendance and punctuality, sustaining ordinary routine without special supervision, performing at a consistent pace without unreasonable rest periods, responding appropriately to changes in a routine work setting, and dealing with normal work stress. (Tr. 601.)  Dr. Fawver reported a "seriously limited but not

precluded" ability to work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday or workweek without interruptions from psychologically-based symptoms, or get along with coworkers without unduly distracting them or exhibiting behavioral extremes. (Tr. 601.)  He also opined that Rasnick was moderately limited in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, and that his ability to remember, understand, and carry out simple instructions was limited, but satisfactory. (Tr. 601-03.)  Dr. Fawver noted Rasnick's highly supportive living arrangement and opined that, considering the nature of his injuries, even a minimal increase in mental demands or a change in environment could cause Rasnick to decompensate. (Tr. 603.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

11

substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). After the Commissioner determines that a claimant is disabled, it will evaluate the claimant's impairments "from time to time" to determine if the claimant remains eligible for DIB. 20 C.F.R. § 404.1589. An individual's disability ends when substantial evidence demonstrates that his impairments have medically improved to the point that he can engage in substantial gainful activity. 42 U.S.C. § 423(f).

To determine if a claimant is still disabled, the Commissioner follows an eight-step evaluation process known as the continuing disability review, requiring consideration of the following issues, in sequence:

1.  Is the claimant engaging in substantial gainful activity? If so, the Commissioner will find disability to have ended.

2.  Having found that the claimant is not engaging in substantial gainful activity, does he have an impairment or combination of impairments which meets or equals the severity of one of the impairments listed by the Commissioner? *See* 20 C.F.R. § 404, Subpt. P, App. 1. If so, then disability will continue.

12

3.  Having found at step two that the claimant's impairment does not satisfy a listing, has there been medical improvement as shown by any decrease in the medical severity of the claimant's impairment(s)?  If there has been a decrease in medical severity, then proceed to step four; if there has been no decrease in medical severity, then proceed to step five.

4.  Having found at step three that there has been medical improvement as shown by a decrease in medical severity, the Commissioner must determine whether it is related to the claimant's ability to do work, that is, whether there has been an increase in the residual functional capacity ("RFC") that was present at the time of the most recent favorable medical determination.  If the medical improvement is not related to the claimant's ability to do work, proceed to step five; if the medical improvement is related to the claimant's ability to do work, proceed to step six.

5.  Having found at step three that there has been no medical improvement or at step four that the medical improvement is not related to the claimant's ability to work, the Commissioner next considers whether any exceptions apply.  If no exception applies, then disability continues.  If a particular exception applies, proceed to step six.

6.  Having found at step four that the claimant's medical improvement is related to his ability to work or at step five that a particular exception applies, the Commissioner must determine if the claimant currently has a severe impairment.  If the claimant's impairment(s) is severe, proceed to step seven.  If the claimant does not have a severe impairment, he is no longer disabled.

7.  Having found at step six that the claimant's impairment(s) is severe, the Commissioner will assess his current ability to do substantial gainful activity in accordance with 20 C.F.R. § 404.1560.  That is, the Commissioner will assess the claimant's RFC based on the claimant's current impairments and consider whether he can still do work he has done in the past.  If the claimant can do such work, he is no longer disabled.  If the claimant cannot do such work, proceed to step eight.

8.  Having found at step seven that the claimant can no longer perform his past work, the Commissioner will find the claimant is not disabled if he can perform other work, given his RFC, age, education, and vocational experience.

*See* 20 C.F.R. § 404.1594(f).

### B.  The ALJ's Decision

On March 1, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 481-98.)  He found at step one of the eight-step analysis that Rasnick had not engaged in substantial gainful activity during the relevant period. (Tr. 483.)  At step two, the ALJ determined that Rasnick had the following medically determinable impairments: a history of extremity spasticity/tremulousness/incoordination related to a head injury, a history of a cervical spine injury that required fusion surgery, evidence of slurred speech, labile mood disorder related to a head injury, major depressive disorder, generalized anxiety disorder, and post-concussion syndrome with a history of head injury and memory loss. (Tr. 483.)  These impairments, however, were not severe enough to meet or equal a listing. (Tr. 483.)  The ALJ then found at step three that as of August 26, 2004, there had been improvements in Rasnick's medical impairments. (Tr. 485.)

The ALJ concluded that as of August 26, 2004, and through the date he was last insured for benefits, Rasnick had the following RFC:

> [T]he claimant had the residual functional capacity to perform a limited range of light work . . . .  His capacities for the full range were reduced in that he could not engage in constant head or neck movements, do any overhead work, or climb ladders, ropes, or scaffolds; use his hands on a constant basis or for fast-paced work; or engage in more than occasional postural changes with respect to balancing[,] stooping[,] kneeling[,] crouching[,] and climbing ramps and stairs. The claimant could engage in oral communications, but not on a constant basis. With respect to his work environment, the claimant needed to avoid hazards, including working at unprotected heights and around dangerous moving machinery.  The claimant retained the mental residual functional capacity to perform simple routine tasks on a sustained basis eight hours a day, provided such tasks allowed for a flexible work pace, did not require a fast-pace, and involved only occasional, brief, and routine interactions with others.

(Tr. 485-86.)  At step four, the ALJ concluded that the medical improvement was related to

14

Rasnick's ability to work because it resulted in an increase in his RFC. (Tr. 485-86.) Accordingly, the ALJ omitted step five. (Tr. 496.)

At step six, the ALJ opined that Rasnick's impairments were severe. (Tr. 496.)  At step seven, the ALJ concluded that Rasnick was unable to perform his past relevant work. (Tr. 496.) Finally, at step eight, the ALJ concluded that as of August 26, 2004, through the date he was last insured for DIB, Rasnick was able to perform a significant number of other jobs in the economy, including laundry worker, stocker checker, and cafeteria attendant. (Tr. 497.)  Accordingly, Rasnick's claim for DIB was denied. (Tr. 498.)

*C.  The ALJ's Evaluation of Dr. Fawver's Opinion*
*Is Supported by Substantial Evidence*

Here, Dr Fawver, who treated Rasnick from June 2007 through 2009, checked two boxes on the mental impairment questionnaire directly relevant to whether Rasnick satisfied the "paragraph C" criteria of Listings 12.02, organic mental disorder; 12.04, affective disorder; and 12.06, anxiety-related disorder.  Specifically, Dr. Fawver opined that Rasnick had (1) experienced three episodes of decompensation within a twelve month period, each of at least two weeks duration, and (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate. (Tr. 603.)  Ultimately, the ALJ rejected this evidence and found at step three that Rasnick did not meet or satisfy a listing.  Rasnick now challenges the ALJ's step three finding, contending that the ALJ's rejection of Dr. Fawver's opinion pertaining to the paragraph C criteria of Listings 12.02, 12.04, and 12.06 is not supported by substantial evidence.

15

The listings describe impairments that are considered presumptively disabling when specific criteria, referred to as paragraph "A," "B," or "C" criteria, are met. *See* 20 C.F.R. § 404.1525(a). To meet or equal a listed impairment, a claimant must satisfy all of the criteria specified in the listing. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Specifically, with respect to Listings 12.02 and 12.04, "[t]he required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied." 20 C.F.R. § 404, Subpt. P, App., §§ 12.02, 12.04. For Listing 12.06, "[t]he required level of severity . . . is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied." 20 C.F.R. § 404, Subpt. P, App., § 12.06. The burden of proving that his condition meets or equals a listed impairment rests with the claimant. *Maggard*, 167 F.3d at 380; *see also Shinaberger v. Barnhart*, No. 1:05-cv-0276-DFH-TAB, 2006 WL 3206338, at *11 (S.D. Ind. Mar. 31, 2006) ("In demonstrating medical equivalence, the claimant has the burden of presenting 'medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" (emphasis in original) (quoting *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002))). Here, as stated above, Rasnick challenges only the ALJ's conclusion that he failed to satisfy the paragraph C criteria of the applicable Listings.

> In that regard, paragraph C of Listings 12.02 and 12.04 requires:
>
> Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would

16

be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, Subpt. P, App., §§ 12.02, 12.04.  And paragraph C of Listing 12.06 requires simply that the medically documented findings described in paragraph A result in the claimant's "complete inability to function independently outside the area of one's home." 20 C.F.R. § 404, Subpt. P, App., § 12.06.

Here, when discussing the C criteria of the applicable Listings at step 3, the ALJ stated:

Although the evidence suggests that the claimant had a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate, the undersigned finds that this criteria is not satisfied for reasons discussed more fully below.

(Tr. 485.)  Then, in a subsequent part of his decision, the ALJ explained in lengthy detail why he declined to adopt Dr. Fawver's check-the-box findings about the paragraph C criteria:

In assessing the "C" criteria of the Listings Dr. Fawver found that the claimant had a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.  This assessment is more realistic considering the evidence at hand.  However, the evidence shows that the claimant had the cognitive ability to complete an Associate[']s degree in computer design.  This implies that he had the abilities to concentrate, persist, and use his hands on at least a somewhat regular basis.  Furthermore, the consultative mental examination did not confirm a cognitive status consistent with a great loss in memory.  Specific testing for memory deficits by Wayne Von Bargen Ph.D., yielded memory scores that were within the average range, except for delayed auditory recognition which was only low average.  Furthermore, Dr. Von Bargen assessed the claimant's capacities to recall information and sustain attention/concentration as average.  The results of the consultative examination are consistent with observations by Dr. Fawver during his initial mental status exam of the claimant in June 2007 wherein he noted that there were no memory disturbances evident and intelligence was average per vocabulary.

17

Furthermore, from an emotional perspective Dr. Fawver's treatment records show that with psychotropic medication therapy the claimant's mood improved. Over the course of his treatment the claimant experienced some exacerbations in his symptoms often associated with side-effects from his medications. The treatment records show that at most visits medi[c]ation changes were made generally by one of the nurses at Dr. Fawver's office with Dr. Fawver seeing the claimant on a somewhat infrequent basis.

. . . .

[Dr. Fawver's] treatment records reflect problems with anxiety, depression, and post-concussion syndrome with some, but not always apparent memory disturbance. Most of the treatment records indicate that the severity of his condition was assessed as moderate and was only rated at severe for a brief period. During this brief period, the records indicate that the claimant was improving which seems somewhat inconsistent with a continued rating of severe. The records further show that on the occasion the claimant had some bad reactions to his medications, but adjustments were promptly made with generally short-lived adverse effects and with improvement in his mood and irritability. The records also reflect a number of activities that do not support a finding of disability, including watching his young energetic son.

The evidence when considered in its[] entirety does not show the claimant to be so functionally limited that he cannot perform even a simple routine task consistent with the above-determined [RFC]. Lastly, this finding is consistent with Dr. Fawver's assessment that the claimant's abilities to remember, understand, and carry out very short and simple instructions were limited, but were still satisfactory as well as his assessment that although the claimant's abilities to work with others and complete a normal work day/week were seriously limited, such activities were not precluded. Great weight, but not controlling weight has been given to Dr. Fawver's assessment to the extent it is consistent with the above-determined [RFC].

(Tr. 491-94.)

Rasnick argues that the ALJ improperly rejected Dr. Fawver's opinion concerning the

paragraph C criteria. To that end, he contends that the ALJ was "simply wrong" when he stated

that Rasnick had earned an associate's degree. (Pl.'s Opening Br. 16.) Indeed, Rasnick testified

at that hearing that he had earned two "certificates," one in computer design technology and the

18

other in computer repair, rather than an associate's degree. (Tr. 707.)  Rasnick, however, fails to

explain how this purported error by the ALJ would make any difference in the outcome. *See*

*Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those

errors or omissions by the ALJ that ultimately do not impact the outcome of the plaintiff's case).

The ALJ cited Rasnick's ability to complete an adult program of study as evidence that his

mental impairments were not as debilitating as he claimed, and Rasnick does not suggest that the

mental skills necessary to earn these certificates required a lower level of mental functioning

than an associate's degree. *See, e.g.*, *Brown v. Astrue*, No. 1:10-cv-450, 2011 WL 5102276, at

\*10-14 (N.D. Ind. Oct. 27, 2011) (observing that the claimant's participation in online college

courses undercut his claims of disability).

    Next, Rasnick argues that the ALJ erred by focusing on his cognitive abilities when

analyzing whether he could decompensate in response to even a minimal increase in mental

demands or a change in the environment. (Pl.'s Opening Br. 16.)  But the ALJ observed that

Rasnick's ability to complete an adult course of study in computer design indicated that he

possessed not only the necessary cognitive abilities and skills, but also "the abilities to

concentrate [and] persist." (Tr. 491.)  The ability to concentrate and persist are relevant factors in

determining whether an individual is likely to decompensate. *See* 20 C.F.R. § 404, Subpt. P,

App., § 12.00 ("Episodes of decompensation are exacerbations or temporary increases in

symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties

in performing activities of daily living, maintaining social relationships, *or maintaining*

*concentration, persistence, or pace*." (emphasis added)).

    In addition, Rasnick challenges the ALJ's finding that his ability to care for his young

son undercut his claim of disability. (Pl.'s Opening Br. 16-17.) Rasnick emphasizes that caring

for his son increased his anxiety and, ultimately, his wife quit her job to care for their son. But

the ALJ did not inappropriately equate Rasnick's caring for his son with an ability to work full

time. *Cf. Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against

placing undue weight on a claimant's household activities in assessing the claimant's ability to

hold a job outside the home"). Rather he simply observed that Rasnick "sees his three-year-old

son once or twice a week" (Tr. 484), "car[es] for his active infant/toddler son" (Tr. 491), and

"watch[es] his young energetic son" (Tr. 494). These observations by the ALJ were not

inaccurate, and, as noted earlier, a claimant's daily living activities are a factor for an ALJ to

consider when considering whether a claimant could decompensate. *See* 20 C.F.R. § 404, Subpt.

P, App., § 12.00; *see, e.g., Mosier v. Astrue*, No. 1:07-cv-118, 2008 WL 938373, at *14 (N.D.

Ind. Apr. 7, 2008) (affirming the ALJ's finding that the claimant's ability to take care of her

daughter undermined her claim of disability, even though the claimant's husband assisted

claimant with the child's care).

Not to be deterred, Rasnick criticizes the ALJ's review and characterization of Dr.

Fawver's treatment records, which the ALJ said showed that Rasnick's medications improved

his condition, despite some exacerbations, and that his overall condition was generally no worse

than moderate. (Tr. 492-93.) Rasnick disagrees, arguing that Dr. Fawver's notes showed

"waxing and waning" of his symptoms and a condition more severe than "moderate." (Pl.'s

Opening Br. 17-18.) Rasnick's challenge is without traction, however, as the ALJ thoroughly

considered Dr. Fawver's treatment notes, dedicating two entire pages in his decision to the topic,

and his characterization of a moderate severity of symptoms, with some period of exacerbations,

is not inaccurate. (Tr. 492-93.)  In fact, even Dr. Fawver characterized Rasnick's impairments in the *same* manner, opining that Rasnick experienced  "moderate" limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 603.)  Thus, Rasnick's argument challenging the ALJ's summation of Dr. Fawver's notes is as unavailing as his other arguments pertaining to the paragraph C2 criteria of Listings 12.02 and 12.04, and the ALJ's rationale for rejecting this portion of Dr. Fawver's check-the-box medical impairment questionnaire is supported by the record and easily traced.

Moreover, Rasnick does not challenge the ALJ's rejection of Dr. Fawver's representation that he experienced repeated episodes of decompensation, each of extended duration—that is, the paragraph C1 criteria of Listings 12.02 and 12.04.  Episodes of decompensation are:

> "[E]xacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.  [A]n exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).  Episodes of decompensation may be inferred from medication records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 C.F.R. § 404, Subpt. P, App., § 12.00.  The ALJ correctly noted that "Dr. Fawver's own records do not show any major decompensation episodes" in that "claimant was only getting outpatient therapy, was never hospitalized, and never required residential placement or case management services." (Tr. 491; *see also* Tr. 484.)  Indeed, as the ALJ noted, Rasnick's "psychological treatment was minimal" and any temporary increases in symptoms were "treated with medication changes/adjustments[,] which does not rise to the level of a decompensation of

21

extended duration in functioning for about two weeks as defined by the Social Security regulations." (Tr. 491.)

Neither does Rasnick argue, and wisely so, that he met or equaled the Listing 12.02C3, 12.04C3, and 12.06C criteria concerning the inability to function independently or outside of a highly supportive living arrangement.  Although Dr. Fawver noted that Rasnick resided in "a highly supportive living arrangement" with family, he did not indicate that Rasnick was unable to function outside of that living arrangement. (Tr. 603.)  Nor does the evidence of record suggest as much, as Rasnick had the ability to perform a wide variety of tasks, including his own self care, caring for his young son, taking college-level classes, and volunteering for the Red Cross by making deliveries. (Tr. 484, 490-91, 494.)  Thus, substantial evidence also supports the ALJ's conclusion that Rasnick did not meet the Listing 12.02C3, 12.04C3, or 12.06C criteria.

In sum, the ALJ did not err in rejecting Dr. Fawver's representation on the mental impairment questionnaire that Rasnick experienced repeated episodes of decompensation of extended duration and that even a minimal increase in mental demands or change in the environment would cause him to decompensate.  As the ALJ explained, this check-the-box evidence was inconsistent with Dr. Fawver's own treatment records, as well as other substantial evidence of record such as Rasnick's course of treatment and activities of daily living. Consequently, the ALJ's step three finding that Rasnick did not meet or satisfy Listings 12.02, 12.04, or 12.06 is supported by substantial evidence.

### D.  The ALJ's Evaluation of Dr. Von Bargen's and Dr. Unversaw's Opinions Is Supported by Substantial Evidence

Next, in a rather cursory argument, Rasnick criticizes the ALJ for purportedly

"credit[ing] the opinions of Dr. Unversaw (a non-examining state agency reviewer) and Dr. Von

Bargen (a one-time examiner) over those of all the treating mental health sources." (Pl.'s

Opening Br. 18.)  To review, upon testing Rasnick in July 2004, Dr. Von Bargen found no

significant cognitive deficits and concluded that Rasnick had an average ability to recall

information and sustain attention and concentration. (Tr. 370-73.)  Similarly, in February 2005,

Dr. Unversaw reviewed Rasnick's record and concluded that he had no medically determinable

mental impairment. (Tr. 408.)  Like his first argument, Rasnick's second argument does not

merit a remand of this case.          The Seventh Circuit Court of Appeals has stated that "more

weight is generally given to the opinion of a treating physician because of his greater familiarity

with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. §

404.1527(c)(2).  However, this principle is not absolute, as "[a] treating physician's opinion

regarding the nature and severity of a medical condition is [only] entitled to controlling weight if

it is well supported by medical findings and not inconsistent with other substantial evidence in

the record."[5] *Clifford*, 227 F.3d at 870; *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir.

2002); 20 C.F.R. § 404.1527(c)(2).

After reviewing the opinions of Dr. Unversaw and Dr. Von Bargen, the ALJ articulated

that Dr. Unversaw, as a state agency psychologist, "is considered to be an expert in evaluating

disability." (Tr. 490.)  He also contemplated that Dr. Von Bargen "had the opportunity to

---

[5] In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(c); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

23

observe and test the claimant which would entitled his opinion to greater weight." (Tr. 490.)  The

ALJ then observed that these two opinions were "consistent with one another" in that Dr.

Unversaw found that Rasnick did not have a severe mental impairment and the results of Dr.

Von Bargen's evaluations was "so unremarkable that [Rasnick] was not given any diagnosis and

GAF was rated at 65." (Tr. 491.)

   Rasnick contends that the ALJ assigned these two opinions too much weight, considering

that neither psychologist reviewed Dr. Fawver's treatment notes or mental impairment

questionnaire, which were generated from 2007 to 2009—that is, after Dr. Unversaw and Dr.

Von Bargen rendered their opinions. (Pl.'s Opening Br. 18.)  But Dr. Unversaw's review and Dr.

Von Bargen's examination took place near the time when Rasnick's DIB ended  in August 2004,

and he was only insured for DIB through June 30, 2006.  Thus, these physicians' opinions were

rendered when Rasnick was still eligible for DIB, not three years *after* Rasnick's date last

insured like Dr. Fawver's medical impairment questionnaire. *See, e.g.*, *Rubio v. Astrue*, No. 10-

cv-6529, 2011 WL 3796755, at *9 (N.D. Ill. Aug. 24, 2011) (rejecting claimant's argument that

the state agency physician's opinions should have been discounted because they did not review a

treating physician's opinion rendered fourteen months after the claimant's date last insured);

*Wright v. Astrue*, No. 08-cv-231, 2008 WL 4829950, at *11 (W.D. Wis. Oct. 27, 2008)

(concluding that because the physicians' opinions post-dated the claimant's date last insured and

assessed her current limitations, they were not relevant to the period at issue (citing *Sienkiewicz*

*v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005))).

   In any event, there is no indication that the ALJ assigned Dr. Unversaw's opinion great

weight.  In fact, he concluded at step two that Rasnick's cognitive dysfunction and mood

disorder were indeed severe impairments. (Tr. 483.)  And as to Dr. Von Bargen's opinion, the ALJ properly considered the appropriate factors under 20 C.F.R. § 404.1527 when deciding what weight to assign the opinion.  Specifically, he noted that Dr. Von Bargen was an examining psychologist and that he performed mental status testing that yielded no significant cognitive deficits, memory scores generally within the average range, and an average ability to sustain attention and concentration. (Tr. 490-92, 495.)  The ALJ further concluded that Dr. Von Bargen's opinion was consistent with Dr. Fawver's initial examination findings, as well as Rasnick's wide variety of daily living tasks. (Tr. 492, 495.)  Thus, the ALJ adequately explained the weight he assigned to Dr. Von Bargen's opinion, and the Court will not accept Rasnick's plea to reweigh the medical source opinions at this juncture. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir.2000) (explaining that the court is not allowed to substitute its judgment for the ALJ by "reweighing evidence"); *Glover v. Astrue*, No. 2:08–cv–262, 2010 WL 989934, at *8 (N.D. Ind. Mar. 16, 2010) (explaining that a court reviews the ALJ's decision to determine if he provided a reasonable explanation for the amount of weight he assigned to the opinion).

Furthermore, as explained above, the ALJ *did* assign great weight to portions of Dr. Fawver's opinion, and he thoroughly explained why he rejected other portions of the opinion that were inconsistent with Dr. Fawver's own treatment notes, as well as other evidence of record.  Of course, "[w]hen treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision." *Dixon*, 270 F.3d at 1178; *see Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (noting that an ALJ's decision to give lesser weight to a treating physician's opinion is afforded great deference so long as the ALJ minimally articulates her reasons for doing so); *Skarbek v. Barnhart*, 390 F.3d

500, 503 (7th Cir. 2004) ("An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician . . . .").  Here, substantial evidence supports the ALJ's consideration of the opinions of Dr. Fawver, Dr. Unversaw, and Dr. Von Bargen, and thus Rasnick's second argument does not warrant a remand of the Commissioner's final decision.

### E.  The ALJ's Consideration of Enos Rasnick's Testimony Is Supported by Substantial Evidence

Finally, Rasnick contends that the ALJ erred by "failing to mention" or "discuss [the] credibility" of the testimony of his father, Enos, concerning his inability to complete tasks on the job.  But the ALJ did indeed expressly consider Enos's statements about his son's impairments and their impact on his work performance, as he penned an entire paragraph specifically on that matter. (Tr. 490; *see also* Tr. 488.)  Thus, Rasnick's assertion that the ALJ failed to mention his father's testimony is utterly baseless.

Furthermore, the ALJ did not necessarily have to independently evaluate the testimony of this witness.  If testimony is "redundant," an ALJ does not need to independently evaluate it, since the testimony is not a separate line of evidence. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993); *see Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996); *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Brandenburg v. Social Sec. Admin.*, No. 104CV01376DFHWTL, 2005 WL 2148119, at *6 (S.D. Ind. Aug. 2, 2005).

In *Carlson*, for example, the claimant objected to the ALJ's failure to specifically discuss his wife's testimony, but the Seventh Circuit found that the testimony "essentially corroborated Carlson's account of his [symptoms] and his daily activities" and therefore was "essentially

26

redundant." *Carlson*, 999 F.2d at 181; *see also Books*, 91 F.3d at 980 (finding that claimant's brother's testimony was not a separate line of evidence but instead "served strictly to reiterate, and thereby corroborate, [the claimant's] own testimony concerning his activities and limitations"). Here too, Enos's testimony essentially corroborated Rasnick's own testimony concerning the limitations caused by his impairments, and, therefore, his testimony did not constitute a separate line of evidence that the ALJ needed to specifically evaluate.

Thus, to the extent the ALJ found Rasnick's testimony regarding his limitations "to be untenable when contrasted with his reported daily activities and the relevant medical evidence, he necessarily found [his father's] supporting testimony similarly not credible." *Books*, 91 F.3d at 980. As a result, Rasnick's argument that the ALJ improperly "failed to mention" or "discuss [the] credibility" of his father's testimony is without merit.

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Rasnick.

SO ORDERED.

Enter for this 30th day of August, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge